**Opinion issued July 9, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-01033-CV

———————————

## IN THE INTEREST OF D.D.M., J.C.M., AND J.D.M., JR., CHILDREN

———————————

**On Appeal from the 300th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 89321-F**

———————————

## MEMORANDUM OPINION[1]

Appellant J.M. appeals after having his parental rights to his two children

terminated. He contends that the evidence is legally and factually insufficient to

---

[1]    We withdraw our memorandum opinion and judgment dated May 2, 2019 and issue this new opinion. Because we issue this new opinion, the appellee's motion for en banc reconsideration is moot. *In re Wagner*, 560 S.W.3d 311, 312 (Tex. App.—Houston [1st Dist.] 2018, orig. proceeding [mand. denied]) ("Because we issue a new opinion in connection with denial of rehearing, the motion for en banc reconsideration is rendered moot.").

support a finding that he engaged in endangering conduct under Family Code section 161.001(b)(1)(E) and a finding that termination was in his children's best interest. He further contends that the trial court abused its discretion by appointing the Department of Family and Protective Services as permanent managing conservator of the children. Because the evidence is factually insufficient to support the trial court's finding that termination is in the children's best interest, we reverse the order of termination and remand for a new trial. We affirm, however, the trial court's appointment of the Department as permanent managing conservator of the children.

### Background

J.M. is the biological father of two children, five-year-old D.D.M. and six-year-old J.D.M., the subjects of this suit. J.M. ended his relationship with the children's biological mother after he found out that she was having multiple affairs. One of the affairs resulted in the mother having another child, six-year old J.C.M. Although J.M. was not J.C.M.'s biological father, she called J.M. "daddy" and otherwise treated him as her father. After the couple split up, J.M. lived with his sister at her apartment, and the children stayed at the mother's apartment. The mother had another child, M.N., with yet another man after her relationship with J.M. ended.

Sometime after the couple split up, J.M. learned through Facebook messages that some men at the mother's apartment were "whooping on [his] kids." J.M. called the police and asked them to conduct a welfare check on the children. A man living with the mother later spoke with J.M. over the phone and asked why he called "the police to come out and check on [the] kids." The record does not indicate how or if the police actually conducted the welfare check, but it is clear that the children were not taken from the mother. J.M. was still concerned that men at the mother's apartment were abusing his children, so he attempted to get the children from the mother's apartment himself.

After a friend drove him to the mother's apartment, J.M. approached and knocked on the mother's door. He heard through the door a man on the inside say, "This is your baby daddy at the door." Then he heard a gun cock. J.M. quickly moved away from the door and returned to his friend's car, but he did not leave; he was still worried about the safety of his children. He looked back at the door to the mother's apartment and saw that it had been opened. J.M. turned to his friend and said, "Look here, man. I am here to try to get one of my kids." He then went back to the door and saw his son D.D.M. J.M. grabbed D.D.M., returned to the car, and left. J.M. later stated that, had the opportunity presented itself without the risk of being shot, he would have taken all the children.

In early winter 2016, after J.M. got D.D.M. from the mother's house, he called the police for a second time and asked that they check again on the children at the mother's apartment. The police told him that there was nothing they could do because the Department had already taken the children from the home. This was news to J.M. The Department then sent a caseworker to the sister's apartment where J.M. was staying with D.D.M. The caseworker explained to him that J.C.M. and J.D.M. were taken from the mother on November 22, 2016, after the Department discovered that the mother's boyfriend had drowned two-month-old M.N. in a toilet because he would not stop crying.[2] Within a week, the Department filed suit seeking custody of J.C.M. and J.D.M.

The following month, J.M.'s sister kicked him and D.D.M. out of her apartment. While on a bus with D.D.M., J.M. called the Department and informed it that he had been kicked out of his sister's apartment. He explained that he and D.D.M. were going to a relative's house to see if they could stay there or otherwise receive help. Later that same day, J.M. informed the Department that his sister was allowing him and D.D.M. to stay at her apartment but that she wanted him out within thirty days. Three days later, J.M. called the Department again. He informed it that he would not be able to find a place to stay before his sister kicked him out.

---

[2]    The man who murdered M.N. was later convicted and sentenced to life in prison. *See Gorman v. State*, No. 01-18-00316-CR, 2019 WL 610739 (Tex. App.—Houston [1st Dist.] Feb. 14, 2019, no pet.) (mem. op., not designated for publication).

J.M. stated that he had only $80 of food stamps and four diapers and that he would be incapable of properly caring for D.D.M. after being kicked out. As he put it, "I didn't want [D.D.M.] to sleep on the fence like I had to." The Department asked J.M. if he understood that he was asking it to take his child from him. He stated that he understood, and the Department took D.D.M. into its care.

On January 23, 2017, the Department filed an original petition seeking custody of D.D.M. This case was consolidated with the Department's earlier petition that sought custody of J.C.M. and J.D.M.[3] The Department provided J.M. with a family-services plan that laid out requirements he had to satisfy to ensure that his parental rights were not terminated. The requirements included that he "participate in random drug testing"; "complete drug and alcohol assessments" if he tested positive on a drug test; "complete a psychological evaluation"; "participate in individual therapy"; and "maintain a safe and stable home environment as well as maintain employment."

By the time trial began in September 2018, J.M. had taken four drug tests. The first was a leg-hair test on October 2, 2017. He tested positive for methamphetamine at a level indicating "very heavy use"; he also tested positive for

---

[3] The Department also sought termination of the mother's parental rights as well as the parental rights of J.C.M.'s biological father. The trial court terminated the mother's rights as to D.D.M., J.D.M., and J.C.M. and the parental rights of J.C.M.'s biological father. Neither the mother's or J.C.M.'s father's terminations are before us.

marijuana. The second was a urine test a day later. He again tested positive for methamphetamine. The third was another leg-hair test, conducted on January 10, 2018. He tested positive for methamphetamine, marijuana, and cocaine. The fourth was also a leg-hair test. It was conducted on April 4, 2018 and returned positive for methamphetamine. J.M. completed his final drug test, another leg-hair test, on September 21, 2018, eight days after trial began. The final test returned positive for methamphetamine and ecstasy.

Trial testimony revealed that J.M. completed his psychological evaluation and the drug and alcohol assessment, he was participating in individual therapy, he had been living in a safe home with his new girlfriend for four months, he was working forty hours a week at McDonald's earning $8.45 an hour, and he never missed a visit with his children. J.M. testified that he and his girlfriend were capable of paying their rent, utilities, and other expenses and would have enough money left over to cover food, education, medical, and related expenses for D.D.M. and J.D.M. A Department caseworker testified that the children loved their father and enjoyed their visits with him.

The same caseworker explained that J.D.M. was diagnosed with a "mood disorder and conduct disorder, oppositional defiant disorder, and ADHD." She explained that, in the Department's care, J.D.M. is enrolled in weekly therapy to address these disorders. The caseworker testified that D.D.M. has "impulse control

6

and conduct disorder and ADHD" and that he is currently in "play therapy." The caseworker averred that it was the Department's position that J.M.'s rights should be terminated and that the children should not be split apart but be placed together.

The trial court also heard testimony from a Court Appointed Special Advocate. The CASA testified that the father's rights should not be terminated. When asked why, the CASA replied:

> I'm at all the visits that [J.M.] has. He is very bonded with the children. The children are very bonded with him. Could he take care of them all the time? I haven't seen that yet. But they do . . . look forward to him. They do interact with him. Yes, they do wear him out, but there's a bond there. There's a definite bond.

The trial court struggled on the record with this difficult case. The trial court explained that it was clear that the children were bonded to and loved J.M. It rejected the Department's argument that J.M. placed the children in a situation that endangered their emotional and physical safety when he took D.D.M. from the mother's apartment but left the other children there, noting "it was clear from the evidence he didn't want to leave the child there" but felt that he had to or risk serious physical harm to either himself or the children. Nevertheless, the trial court concluded that J.M.'s drug tests indicated, at the very least, that he used illicit drugs two months before trial, and that it was likely he used drugs during trial.

The trial court noted that J.M.'s drug use was problematic both because he was well aware of the fact that his parental rights were in question, yet he still used

7

drugs, and because his testimony was entirely inconsistent on his drug use: At first, when J.M. was asked about his drug use, he "plead[ed] the Fifth," then he claimed to have never used any drugs, and then—after repeated questioning—he admitted to using drugs at some point in the past. Accordingly, the trial court concluded that, by using illicit drugs, J.M. engaged in conduct that put the children's physical and emotional well-being at risk. For this reason, in addition to all of the other evidence presented, the trial court concluded that termination would be in the children's best interests. Accordingly, the trial court terminated J.M.'s parental rights.

**Analysis**

J.M. challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that he engaged in conduct that endangered the physical or emotional well-being of his children under Family Code section 161.001(b)(1)(E), and the trial court's finding that termination of his parental rights would be in the children's best interests under Family Code section 161.001(b)(2). J.M. also challenges the trial court's appointment of the Department as the permanent managing conservator of the children.

## I. Standard of review

It is well-established that a suit affecting the relationship between parents and their children implicates a natural right that is "far more precious than any

property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)); *In re J.W.T.*, 872 S.W.2d 189, 194–95 (Tex. 1994). And when the government seeks to terminate that natural right, constitutional-based protections activate: Legislation that authorizes involuntary termination is strictly construed, the government must justify termination with "clear and convincing evidence," and termination orders are strictly scrutinized. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *cf. Ray v. Burns*, 832 S.W.2d 431, 434 (Tex. App.—Waco 1992, no writ) (in reviewing sufficiency of evidence, "close calls" go to parent (citing *Lewelling v. Lewelling*, 796 S.W.2d 164, 168 (Tex. 1990)). "Clear and convincing" evidence denotes that "measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002).

In a proceeding to terminate a parent-child relationship brought under Family Code section 161.001, the Department must prove two elements by clear and convincing evidence: It must establish a predicate statutory finding by showing one or more acts or omissions enumerated under section 161.001(b)(1), and it must demonstrate that termination of parental rights is in the children's best interests. TEX. FAM. CODE § 161.001(b)(1), (2); *In re B.L.D.*, 113 S.W.3d 340, 353–54 (Tex.

9

2003). Proof of one element cannot obviate proof of the other. *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976).

This clear-and-convincing-evidence standard renders the typical standards of review for legal- and factual-sufficiency challenges inadequate. *In re J.F.C.*, 96 S.W.3d 256, 264–68 (Tex. 2002). To assess the legal sufficiency of the evidence in a termination proceeding, we consider all evidence in the light most favorable to the trial court's finding and decide "whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id.* at 266; *see also City of Keller v. Wilson*, 168 S.W.3d 802, 814–17 (Tex. 2005). We assume that any disputed facts were resolved in favor of the finding if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. Where "no reasonable factfinder could form a firm belief or conviction" that the matter on which the Department bears the burden of proof is true, we "must conclude that the evidence is legally insufficient." *Id.* In reviewing the evidence's factual sufficiency, we consider the entire record, including disputed evidence. *Id.* (citing *C.H.*, 89 S.W.3d at 25). The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have resolved in favor of the finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction. *Id.*

## II.    Predicate statutory finding under Family Code section 161.001(b)(1)(E)

We begin with the legal and factual sufficiency of the evidence for the predicate statutory finding under section 161.001(b)(1). The trial court made a predicate statutory finding under section 161.001(b)(1)(E). Under that subsection, a parent commits the predicate statutory act of endangerment if he "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). "Endanger" means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). The relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

In determining whether a parent engaged in "endangering" conduct, a trial court may consider conduct that occurred before and after the child's birth, in the child's presence and outside the child's presence, and before and after removal by the Department. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *Walker v. Tex. Dep't of Fam. & Prot. Servs.*, 312 S.W.3d 608, 617–18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Because a parent's drug use exposes children "to the possibility that the parent may be impaired or imprisoned," it may constitute

11

endangerment of the child's emotional and physical well-being. *Walker*, 312 S.W.3d at 617–18 (citing *Vasquez v. Tex. Dep't of Prot. & Reg. Servs.*, 190 S.W.3d 189, 195–96 (Tex. App.—Houston [1st Dist.] 2004, pet. denied)). And where the record contains evidence that a parent engages in drug use during the pendency of a termination suit, when he knows he is at risk of losing his children, the evidence is legally sufficient to support a finding of endangerment. *In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

J.M. tested positive for methamphetamine in October 2017, January 2018, April 2018, and September 2018, for marijuana in October 2017 and January 2018, and for cocaine in January 2018 and September 2018. Considering the Department's expert's testimony that leg-hair tests can indicate only whether an individual used the tested-for drug within the last six months, the September 2018 test could reflect use of methamphetamine, at the earliest, in March 2018, which is over a year after the Department sought to terminate J.M.'s parental rights. Considering all the evidence, a factfinder reasonably could have inferred that J.M. used illegal drugs during the pendency of this suit. Therefore, the evidence is legally sufficient to support a finding of endangerment. *See id.* at 580. And because no evidence directly contradicts that reasonable inference, the evidence is factually sufficient to support a finding of endangerment. *See id.*

We are unconvinced by J.M.'s argument that the evidence of his good acts outweighs or precludes a finding of endangerment. Section 161.001(b)(1)(E) asks a yes-or-no question: Whether the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." That a parent engages in endangering conduct but also engages in other conduct that is good for the child's emotional or physical well-being does not change the fact that the parent engaged in endangering conduct. We therefore overrule J.M.'s first issue.

## III.    The children's best interest

J.M. next challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that termination of his parental rights is in his children's best interests. Our analysis of the entire record is guided by the factors set out in *Holley v. Adams*: (1) the child's desires; (2) the child's current and future physical needs; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interests; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. 544 S.W.2d at 371–

72. The focus of this non-exhaustive list of factors is on the best interests of the children, not of the parent. *Dupree v. Tex. Dep't of Prot. & Reg. Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). Courts may consider any other factor relevant to the children's best interest, including evidence that establishes the predicate act under section 161.001(b)(1). *See C.H.*, 89 S.W.3d at 27–28. There is, however, "[a] strong presumption . . . that a child's best interests are served by preserving the parent-child relationship, where possible." *Burns v. Burns*, 434 S.W.3d 223, 230 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

The children desire to remain with their father. The CASA, who supervised J.M.'s visits with his children, described the children as having a very strong bond with him and J.M. as having a very strong bond with them. In light of this testimony, and the lack of any evidence indicating that the children did not want to be placed with their father, this factor weighs against termination under the legal- and factual-sufficiency standards of review and in favor of maintaining the parent-children relationship.

Next we consider the children's current and future physical needs. Evidence of this factor generally demonstrates what the children's physical needs are, specifically any special physical needs, and whether the parent seeking custody was willing and able to meet those needs. *See In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012). There was no evidence presented that the children had any physical

needs aside from the basics such as housing and sustenance. J.M. testified that he was working forty hours a week, he had a new home where the children could stay, his girlfriend—who has no criminal or CPS history—was willing and able to watch the children while he was at work, and he had the means to ensure the children were fed, taken to school, and taken to their medical appointments. Nevertheless, under a legal-sufficiency review, we must presume that the trial court disbelieved J.M.'s testimony that he could meet his children's physical needs. *See In re A.S.*, 261 S.W.3d 76, 87 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Accordingly, under a legal-sufficiency review, this factor weighs in favor of termination. Under a factual-sufficiency review, however, we must consider all of the evidence equally. *Id.* In light of J.M.'s testimony that he had the means and willingness to meet his children's physical needs, and the lack of any evidence indicating that the children had any unique physical need or any physical need that would be unmet if the children were in J.M.'s care, this factor weighs against termination under a factual-sufficiency review. *See E.N.C.*, 384 S.W.3d at 808 ("As to the second *Holley* factor, the court of appeals stated that the children's emotional and physical needs are great, but did not explain or cite any evidence illuminating how those needs differ from other children or would go unmet if the children were with [the father]. As such, we disagree that this factor weighs in favor of termination.").

Under the third *Holley* factor, we consider the emotional and physical danger to the children now and in the future. The caseworker testified that, since coming into the Department's care, J.D.M. had been diagnosed with a "mood disorder and conduct disorder, oppositional defiant disorder, and ADHD." J.D.M., who is age six, also has "severe anger issues." To treat these issues, J.D.M. is currently taking medication and participating in weekly therapy. D.D.M., who is age five, "has impulse control and conduct disorder and ADHD." He also urinates and defecates on himself, a problem that existed before he came into the Department's care but that has since worsened. He is currently in play therapy.

According to the caseworker, the children's unique mental health issues require that certain needs be met so that the children do not face unnecessary emotional danger. The caseworker testified that J.D.M. and D.D.M. "need more of a structure and stable environment and a caregiver that will take care of all their special needs," such as taking them to therapy and medical appointments. The Department presented no evidence that J.M. could not meet these special needs. And, as mentioned above, J.M. testified that if the children were placed in his care, he would ensure that they are taken to their medical appointments. Furthermore, the caseworker testified that it would be in the children's best interest if they were all placed together. If J.M. is given custody of his children, they will be placed together. And while J.D.M. and D.D.M. are currently living in the same foster

16

home, there was no evidence that the brothers would remain together in that placement or in a future placement.

Because a reasonable factfinder could have disbelieved J.M.'s testimony that he would make sure the children were brought to their medical appointments, the third *Holley* factor weighs in favor of termination under a legal-sufficiency analysis. *See A.S.*, 261 S.W.3d at 87. Because, however, J.M. testified that he was willing and able to take the necessary steps to mitigate the emotional and physical danger stemming from the children's mental-health issues, and because no evidence suggests otherwise, this factor weighs against termination under a factual-sufficiency analysis. *See E.N.C.*, 384 S.W.3d at 808.

The fourth *Holley* factor, which focuses on the parental abilities of those seeking custody, ties in with the remaining factors: the programs available to assist the individual seeking custody to promote the children's best interest; the plans for the children by the individual; the stability of the home or proposed placement; the acts or omissions of the parent that may indicate an improper parent-child relationship; and any excuse for those acts or omissions. We therefore address these factors collectively. In addition to these factors, we are also mindful that permanent placement of the children is presumed to be in their best interest. TEX. FAM. CODE § 263.307(a). In addition to the remaining *Holley* factors, other factors relevant to determining whether the parent is willing and able to provide a safe

17

environment are the children's age and vulnerabilities and whether there is a history of abusive or assaultive conduct by the children's family or others who have access to the children's home.

D.D.M. was around five years old and J.D.M. was around six years old at the time of the termination decree. There is no evidence or suggestion in the record that J.M. engaged in assaultive conduct. J.M. testified that one of the reasons he attempted to remove the children from the mother's care was because he had heard that men at her apartment were "whooping" his kids. Further, J.M. averred that he is now living with his new girlfriend in her residence and that he was working forty hours a week at McDonald's. He explained that his new girlfriend has no criminal history or CPS history and is willing and able to watch the children when he is at work. J.M. explained that he and his girlfriend are financially stable and would be capable of caring for the children appropriately, such as taking them to school, taking them to doctors' appointments and dental appointments, and making sure they are fed. Further, the caseworker testified that she visited J.M.'s new home and did not see anything that would be dangerous for the children.

As for willingness to seek, accept, and complete counseling services and cooperate with agency supervision, J.M. testified that he would do any therapy, take any class, and follow any of the Department's commands he needed to help

him properly care for his children. He also demonstrated this by completing the service plan, attending every visit, and seeking additional visitation.

Although J.M.'s drug use tends to suggest that he has inadequate parenting skills, the record contains evidence that suggests just the opposite. For example, J.M. attempted to remove his children from the mother's apartment because he believed they were being harmed. Despite hearing a man inside cock a gun when he knocked on the door, he waited for an opportunity and was able to successfully remove D.D.M. from the apartment. Further, J.M. called the Department and asked it to pick up D.D.M. before they were kicked out of his sister's apartment, knowing that he would not be able to properly care for D.D.M. on the streets. In addition to his new home, new job, and care plan for his children, these acts demonstrate J.M.'s protective and caring mindset towards his children.

In the trial court and on appeal, however, the Department repeatedly stresses J.M.'s drug use as evidence that termination is in the children's best interest. The Department argued to the trial court that, under the *Holley* best-interest analysis, all the trial judge needed was "one ground under one of those factors to find best interest for termination," and that J.M.'s drug use alone was therefore sufficient to support the best-interest finding. And on appeal, the Department similarly argues that the evidence of J.M.'s drug use is enough to hold that the evidence was legally and factually sufficient on best interest.

19

Although we agree that J.M.'s drug use is evidence that weighs in favor of the best-interest finding, a factor we carefully consider in reaching our conclusion, we cannot ignore all the other evidence and base our holding solely on evidence of J.M.'s drug use. Under both legal- and factual-sufficiency standards of review, we must consider *all* the evidence. *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (holding that court of appeals erred in reversing termination on factual sufficiency grounds by focusing on one pertinent factor "[r]ather than weighing all of the evidence" and "not fully account[ing] for evidence that supported the jury's verdict"); *J.F.C.*, 96 S.W.3d at 266–68; *C.H.*, 89 S.W.3d at 28–29.

The Department alternatively points out what it considers to be two other events that indicate termination is in the children's best interests: J.M.'s failure to remove all of the children from the mother's apartment and his calling the Department to pick up D.D.M. before he was kicked out of his sister's apartment. We disagree that either of these events weighs in favor of termination.

As for J.M.'s failure to remove all of the children from the mother's apartment, the Department's argument is that J.M. removed only D.D.M. despite knowing the dangerous situation all the children were being exposed to in the mother's apartment. The argument ignores other evidence that provides crucial context for J.M.'s actions. As discussed above, after being driven to the mother's apartment by a friend, J.M. knocked on the mother's door. He then heard through

the doorway a gun cock and a man inside say, "This is your baby daddy at the door." He quickly returned to his friend's car but was worried about the safety of his children. He then noticed that the door to the mother's apartment was open. He turned to his friend and said, "Look here, man. I am here to try to get one of my kids." He then went back up to the door and saw D.D.M. He grabbed D.D.M., returned to his friend's car, and left. J.M. testified that if he had the opportunity to remove all of the children from the mother's apartment, he would have done so. Also, he twice contacted the police about all of the children.

The trial court seemed to similarly reject the Department's argument. The Department's original petition was based on alleged predicate acts under section 161.001(b)(1)(D) and (E). The Department's argument under subsection (D)—providing for termination upon a finding that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child"—was the same one it makes here for best interest: That J.M. knowingly left his children in a place where he knew they could be harmed. The trial court rejected the argument in the following exchange:

> THE COURT: I think it was clear from the evidence he didn't want to leave the child there. He went there.
>
> [DEPARTMENT]: But he took one child.
>
> THE COURT: Uh-huh.

[DEPARTMENT]: He could have taken all three.

THE COURT: Could he have? That was clear in the evidence?

[DEPARTMENT]: He told you he only took one child, Judge.

THE COURT: Who -- who testified about that incident? Who was the only one that testified about that?

[DEPARTMENT]: He did, sir.

THE COURT: All right. That's not clear and convincing evidence of Ground D. Period.

That J.M. believed his life was in jeopardy but nonetheless returned to get D.D.M., who was standing in the doorway, is not evidence that supports a finding that termination was in the best interest of the children.

The Department also argues that J.M.'s calling it to pick up D.D.M. before they were kicked out of his sister's apartment is also evidence that termination is in the best interest of the children. That event suggests the opposite. J.M. first informed the Department that his sister wanted him out within thirty days. Three days later, J.M. called the Department again. He informed it that he would not be able to find a place to stay before his sister kicked him out. J.M. stated that he had only $80 of food stamps and four diapers and that he would not be capable of properly caring for D.D.M. after being kicked out. As he put it, "I didn't want [D.D.M.] to sleep on the fence like I had to." The Department asked J.M. if he understood that he was asking it to take his child from him. He stated that he

22

understood, and the Department took D.D.M. into its care. While this is some evidence of J.M.'s instability, it also shows that he was willing to put the best interest of his children first, even if doing so meant that he might lose possession of his children. The evidence is that the circumstance that led J.M. to call the Department in the first place—having no place to stay—no longer exists today; J.M. testified that he now has a home, a home that the caseworker visited and testified was safe for the children. Accordingly, J.M.'s call to the Department requesting that it pick up D.D.M. is not evidence weighing in favor of termination.

Much of the evidence weighing against termination under the remaining *Holley* factors—such as J.M.'s testimony regarding his home, job, girlfriend, willingness to complete counseling services and cooperate with agency supervision—could properly be categorized as disputed evidence because the trial court could have disbelieved his testimony. *See A.S.*, 261 S.W.3d at 87. Under the legal-sufficiency standard, we must presume that the trial court disbelieved J.M.'s testimony. *See id.* Without J.M.'s testimony, the overwhelming majority of the *Holley* factors support termination. Accordingly, we overrule J.M.'s contention that the evidence was legally insufficient to support the trial court's finding that termination would be in the children's best interest.

Under the factual-sufficiency standard, however, we must consider J.M.'s testimony. *See id.* ("While the trial court could have chosen to disbelieve this

testimony, we are mindful that under a factual sufficiency review we must consider all of the evidence equally."). And with J.M.'s testimony, the majority of the *Holley* factors substantially weigh against the best-interest finding, as detailed above. In light of the constitutional concerns related to parental termination, clear instructions from the supreme court to strictly scrutinize termination proceedings and strictly construe involuntary-termination statutes, the strong presumption that preservation of the parent-child relationship is in the children's best interest, the absence of evidence that J.M. would not meet his children's needs, and our obligation under a factual-sufficiency review to consider all evidence equally, we conclude that the record evidence does not permit a reasonable factfinder to form a firm belief or conviction that termination of J.M.'s parental rights would be in J.D.M.'s and D.D.M.'s best interests. We therefore sustain J.M.'s issue that the evidence is factually insufficient to support a finding that termination is in his children's best interests.

## IV. Conservatorship

In his third issue, J.M. asserts that the trial court abused its discretion in appointing the Department as permanent managing conservator of the children. Specifically, he challenges the trial court's finding that his "appointment . . . as permanent managing conservator of the children is not in the children's best

interests because the appointment would significantly impair [the] children's physical health or emotional development."

> Termination of parental rights and the appointment of a non-parent as sole managing conservator are two distinct issues, with different elements, different standards of proof, and different standards of review. *Compare* TEX. FAM. CODE ANN. § 161.001, with TEX. FAM. CODE ANN. § 153.131(a) (West 2008); *See also In re J.A.J.*, 243 S.W.3d 611, 615–17 (Tex. 2007); *Earvin v. Dep't. of Family & Protective Servs.*, 229 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2007, no pet.). There is a rebuttable presumption that it is in a child's best interest for his parents to be named his joint managing conservators. TEX. FAM. CODE ANN. § 153.131(b). To rebut this presumption and appoint someone other than a parent as sole managing conservator of the child, a court must find that appointment of a parent would "significantly impair the child's physical health or emotional development." TEX. FAM. CODE ANN. § 153.131(a); *J.A.J.,* 243 S.W.3d at 616. "The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship[.]" TEX. FAM. CODE ANN. § 153.002.

*In re E.C.A.*, No. 01-17-00623-CV, 2017 WL 6759198, at *14 (Tex. App.—Houston [1st Dist.] Dec. 28, 2017, no pet.) (mem. op.).

We review a trial court's conservatorship decision for an abuse of discretion. *J.A.J.*, 243 S.W.3d at 616. A trial court abuses its discretion if its decision is arbitrary and unreasonable. *Id.* Unlike parental-termination orders, which are subject to a clear-and-convincing-evidence standard, conservatorship orders are governed by a preponderance-of-the-evidence standard. *See id.*

> [T]he standard of review for the appointment of a non-parent as sole managing conservator is less stringent than the standard of review for termination of parental rights. *J.A.J.*, 243 S.W.3d at 616. We review a trial court's appointment of a non-parent as sole managing

25

conservator for abuse of discretion only. *Id.* (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). We reverse the trial court's appointment of a nonparent as sole managing conservator only if we determine that it is arbitrary or unreasonable. *Id.* "Because different standards apply, evidentiary review that results in reversal of a termination order may not yield the same result for a conservatorship appointment." *Id.*

*E.C.A.*, 2017 WL 6759198, at *14.

Throughout trial, the trial court stressed its concern with J.M.'s drug use during the pendency of the case. According to the Department's expert, a leg-hair drug test like the one taken by J.M. will indicate a positive result for methamphetamine if the leg hair contains 300 or more picograms of methamphetamine. J.M.'s leg hair had over 20,000 picograms, an amount the expert averred reflected "very heavy use," likely "daily use." Given the abuse-of-discretion and lightened evidentiary standards applicable to conservatorship decisions, *see J.A.J.*, 243 S.W.3d at 616, the recognition that a parent's narcotics use negatively affects his life and ability to parent, *see Walker*, 312 S.W.3d at 617–18, and the evidence of J.M.'s drug use during the pendency of the case, we conclude that the trial court did not abuse its discretion by appointing the Department as sole managing conservator.[4] *See E.C.A.*, 2017 WL 6759198, at *14 ("The same reasons that we gave for holding the evidence *legally* sufficient to

---

[4] "The trial court retains jurisdiction to modify a conservatorship order if it is in the child's best interest, and the parent's or child's circumstances have materially and substantially changed since the order was rendered." *J.A.J.*, 243 S.W.3d at 617 (citing TEX. FAM. CODE §§ 156.001, 156.101).

26

show that termination was in the children's best interest also supports a holding that naming DFPS as sole managing conservator was not an abuse of discretion."); *In re R.W.*, No. 01-11-00023-CV, 2011 WL 2436541, at *12–14 (Tex. App.—Houston [1st Dist.] June 16, 2011, no pet.) (mem. op.) (holding that evidence was factually insufficient to support finding that termination was in children's best interest but that trial court did not abuse its discretion in appointing DFPS as sole managing conservator). We overrule issue three.

## Conclusion

We affirm that part of the trial court's termination order appointing the Department as permanent managing conservator of D.D.M. and J.D.M. We reverse the order's termination of J.M.'s parental rights to D.D.M. and J.D.M. and remand this case for a new trial.


Richard Hightower
Justice

Panel consists of Justices Lloyd, Kelly, and Hightower.

27